**KARLA E. PAINTER**
**TIMOTHY J. RACICOT**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**P.O. Box 8329**
**Missoula, MT   59807**
**101 East Front Street, Suite 401**
**Missoula, MT 59802**
**Phone:      (406) 542-8851**
**FAX:         (406) 542-1476**
**Email:       Karla.Painter@usdoj.gov**
              **Tim.Racicot2@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| UNITED STATES OF AMERICA, | CR 22-39-M-DWM |
|---|---|
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| vs. | |
| ANDREW KYLE WHITTECAR, | |
| Defendant. | |

INTRODUCTION

Andrew Kyle Whittecar pled guilty to three counts of an indictment: possession with intent to distribute controlled substances (count 2); felon in possession of a firearm (count 4); and money laundering (count 5).   In exchange,

1

the government has agreed to dismiss conspiracy to possess with the intent to distribute controlled substances (count 1), an additional money laundering charge (count 6), and possession of a firearm in furtherance of a drug trafficking crime (count 3), which carries a five-year mandatory minimum consecutive sentence. Doc. 19. Whittecar, however, faces a 10-year mandatory minimum sentence for his conviction under count 2. Doc. 8.

## PSR OBJECTIONS

The Presentence Investigation Report (PSR) has calculated Whittecar's guidelines at 324 months to 405 months based on a total offense level of 40 and a criminal history category of II. PSR ¶ 167. The United States had no objections to the PSR, though Whittecar submitted several:

- His base offense level should be 30 rather than 34 under USSG §2D1.1 as that reflects the amount of fentanyl seized from Whittecar's vehicle and property rather than the much greater weight based on his admissions to law enforcement;

- A two-point increase under USSG §2D1.1(b)(12) should not apply for maintaining a premises for the purpose of manufacturing or distributing a controlled substance;

- A four-point increase under USSG §2D1.1(b)(13) should not apply for

knowingly misrepresenting or marketing as another substance a substance containing fentanyl; and

- Whittecar is entitled to a three-level role reduction under USSG §3B1.2 as he only acted as a drug mule and was thus somewhere between a minor and minimal participant in the drug distribution.   PSR Addendum.

The PSR writer considered and rejected all of Whittecar's contentions, providing detailed analysis for each.   *Id*.   In preparing for sentencing, the parties discussed Whittecar's objections and agreed his base offense level should be reduced to 30 in exchange for him withdrawing his other three objections. Accordingly, the parties stipulate that Whittecar's total offense level should be 36, which yields an advisory guideline range of 210-262 months.   The United States requests this Court impose a sentence at the high end of the guideline range followed by at least five years of supervised release.

## FORFEITURE

Whittecar has forfeited his interest in the following items:

- A tract of land located and being a portion of the SE1/4 of Section 22, Township 9 North, Range 19 West, P.M.M., Ravalli County, Montana, and being more particularly described as Parcel C, Certificate of Survey No. 553338-F, with the address 3414 Prosperity Heights Drive, Stevensville, MT 59870;

3

- 2019 Ford F450 pickup truck bearing Vehicle Identification Number 1FT8W4DT4KEE58515;

- 2008 Ford F450 with a listed Vehicle Identification Number of 1FTXW43R88EB81426;

- 2015 Cadillac Escalade with a listed Vehicle Identification Number of 1GYS4SKJ8FR556876;

- 2021 Big Tex Flatbed Trailer bearing Vehicle Identification Number of 16V3F382XM4024411;

- 2001 Caterpillar Backhoe Model 420D with a listed Serial Number of FDP773;

- $3,000.00 in U.S. Currency; and

- a Glock 17 Gen4 9mm handgun with a listed serial number of BGYL917 and ammunition.

Doc. 19 at 3; Doc. 28. The government posted the notice of forfeiture online for at least 30 consecutive days and 30 additional days have elapsed since that posting. To date, only one claim has been made on the items to be forfeited, specifically the 40-acre parcel of land. Doc. 31. The parties to that matter are engaged in settlement discussions. If a resolution is reached prior to the currently scheduled contested hearing date of February 23, 2023, the United States will advise this Court and submit a motion for a Final Order of Forfeiture.

4

## THE OFFENSE

In 2009, Whittecar was convicted of three federal felonies in Washington for Conspiracy to transfer an Unregistered Firearm, Transfer of an Unregistered Firearm, and Bank Fraud. PSR ¶ 19. He was sentenced to 48 months with the Bureau of Prisons to be followed by five years of supervised release. *Id*. This conviction prohibited Whittecar from possessing a firearm for life.

On April 27, 2022, Whittecar was traffic-stopped in Minnesota and claimed he was traveling from Montana to Madison, Wisconsin to pick up his brother. PSR ¶ 25. Whittecar appeared to be under the influence of narcotics but stated there were no drugs or firearms in his vehicle. PSR ¶¶ 24-28. Whittecar denied consent to search his vehicle and the Minnesota Highway Patrol Trooper deployed his canine which alerted to the presence of narcotics. PSR ¶¶ 29-30. The trooper then searched the vehicle and found $3,000 wrapped in rubber bands in the center console, 3.5 grams of cocaine, and 75 "M-30" fentanyl pills, which resembled Percocet. PSR ¶ 31. When advised he was under arrest, Whittecar attempted to flee on foot but tripped and fell and was detained. PSR ¶ 32.

The trooper searched the trunk of the vehicle and found a Glock 17 handgun with a loaded magazine and a second loaded magazine. PSR ¶ 33. There was also a sealed ammunition box concealed in the spare tire well that contained a large

package wrapped in plastic with what appeared to be petroleum jelly on the outside, which officers suspected was used to mask drug odor. *Id.* Inside the package there were several Ziplock bags containing about two pounds (5,000 pills) of blue M-30 tablets and approximately 1,000 orange pills resembling Adderall. PSR ¶¶ 33-34. DEA lab testing confirmed the blue pills contained fentanyl and the orange pills contained methamphetamine. PSR ¶ 34.

Whittecar later provided a statement to law enforcement officers and stated the pills contained fentanyl and meth but were designed to look like Percocet and Adderall, that he had made between 10 and 15 trips at least monthly from Seattle to Madison with the same quantity of fentanyl (5,000 pills), and that he had been trafficking for a year. PSR ¶¶ 37-40.

Law enforcement later received reports that Whittecar, while incarcerated, had enlisted his family members to move items from his shed in Stevensville, Montana, to another property somewhere in the country. PSR ¶ 44. Law enforcement then obtained and executed a search warrant for a 40-acre parcel of land in Stevensville that Whittecar was in the process of buying. PSR ¶ 45. On the property, officers located a backhoe that was blocking the entrance to a Conex storge container. After moving the backhoe and entering the container they located two pill presses, dyes, chemicals, and other substances indicative of the

manufacturing of counterfeit pills. Some of the press heads had an "M-30" symbol and others had markings for Adderall, which were consistent with the pills recovered from Whittecar's vehicle in Minnesota. Investigators also located a glass jar containing 240 grams of fentanyl powder and a Ziplock bag containing another 161 grams of blue fentanyl powder. *Id*.

On June 1, 2022, investigators searched storage units used by Whittecar and located boxes containing lab equipment and glassware, which appeared consistent with the mixing of chemicals and a clandestine fentanyl laboratory. PSR ¶ 55. Officers also located a large assortment of gun parts including the lower portion of two handguns and a rifle, the upper portion of several rifles, bolts, stocks, triggers, and scopes/optics. *Id*. In addition, they found several magazines, eight ammunition canisters, boxes, and ballistic vests containing various calibers of ammunition including 12-gauge, 308, 5.56 mm, .22, 9mm, and 300 AAA blackout. *Id*.

Two DEA forensic chemists reviewed the chemicals and equipment located in the storage units and concluded they were sufficient to produce fentanyl. PSR ¶ 57. The chemists also advised the Nalazone found on Whittecar's property is commonly used to reverse opioid overdoses and the quantities located were often found in professional laboratories. *Id*.

7

Investigators obtained warrants for the three cellphones in Whittecar's possession during his traffic stop. PSR ¶ 58. Based on the coded language used, officers suspected Whittecar had been involved in the production of drugs since September of 2019. Id. Specifically, those statements included: "calculate production with leftovers," "weigh and whip j bone stuff," "make j bone stuff (30-36) whip in caffein/B12 and some pow sugar!!" "Make more shizz 80-100 g 6-9 batch," "Order addy, xan, bone popper from China," and "New burner phones/cards." In March 2021 Whittecar communicated with Yangzhou Nuoya Machinery Company Ltd to import pill presses and custom dyes and punches and he agreed to wire money to the company via Western Union or MoneyGram. PSR ¶ 59. In July 2021, Whittecar began purchasing other punches and dyes, and requesting dyes for prescription pill markings. Id.

Whittecar made several notes referencing firearms and tactical equipment. One list entitled "Things to buy" included the following:

- Tactical vest/pads/knees/elbows/head
- Magazines (Glock, 9mm, AR .223, AR .308)
- Glock lowers and uppers and hardware
- Night vision, Red dot sighs/ACOG/scopes
- AR belt fed .22 LR kit
- Medical kit/fast clot
- IV bags/kits
- Paint ball guns & ammo 4 training.

8

PSR ¶ 61.

Whittecar's last reported employment was in the fourth quarter of 2018, yet he made several large cash deposits and withdrawals from his bank account over the past two years. PSR ¶ 62. In November 2020 he purchased a 2015 Cadillac Escalade for $44,415 in cash and in January 2021 he bought a 2008 Ford F-450 for $26,000 in cash.

## SENTENCING RECOMMENDATION

Section 3553(a) of Title 18 of the United States Code contains prefatory language —"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Those purposes include the need for the sentence to:

- reflect the seriousness of the offense;
- promote respect for the law;
- provide just punishment for the offense;
- afford adequate deterrence to criminal conduct;
- protect the public from further crimes of the defendant; and,
- provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

9

Section 3553(a) sets forward additional considerations for the Court when imposing an appropriate sentence. "[T]he nature and circumstances of the offense and the history and characteristics of the defendant" and the "kinds of sentences available" should be considered. 18 U.S.C. § 3553(a)(1), (3). The Court should similarly consider the sentencing guidelines and policy statements, as well as "the need to avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(4)-(6).

### A. Nature and circumstances of the offense/defendant's history and characteristics.

Whittecar has been charged with drug and firearms offenses dating back to age 17 (PSR ¶¶ 104-105) and, at 19, he was found in possession of several packages of marijuana, a revolver, a shotgun, two assault rifles, $1,260 in cash, and a drug ledger. PSR ¶ 108. However, his only scoring criminal history points are derived from two separate, complex, and serious schemes which Whittecar also committed at a young age. PSR ¶¶ 97-98. The Bank Fraud conviction does not list a beginning date but reflects the conduct continued for approximately 10 years until December 2006 (when Whittecar turned 22). PSR ¶ 98. Whittecar devised a scheme to defraud banks, merchants, and customers by compromising credit and debit card account numbers. He was identified as the leader of an organized credit card fraud ring and, at the time of his arrest, he had 18 fraudulent debit/credit

10

cards in his possession. Ultimately, he was ordered to pay restitution exceeding $164,000. *Id*.

As to the illegal transportation of firearms, Whittecar shipped guns out of Washington after soliciting others to act as brokers. PSR ¶ 97. Over a three-month period, Whittecar used Federal Express to ship an AR-15 rifle, two semiautomatic firearms, seven semi-automatic handguns, and two sets of body armor to California. *Id*. One of firearms was illegal as it had a high-capacity drum magazine and an attached vertical foregrip. *Id*. Whittecar also arranged to sell an additional six firearms and two rifles for $27,500.

While both cases were consolidated and constituted Whittecar's first felony convictions, his custodial sentence of 48 months underscores the seriousness of his crimes and the harms he caused. Notably, his wife provided information for his PSR in that case which included the following:

> Mrs. Whittecar believes the defendant will be able to remain sober upon release from custody as she believes he would not do anything to jeopardize his freedom in the future. Mrs. Whittecar said this has been 'a huge wake-up call' for the defendant and that he wants to change his lifestyle in order to stay out of jail and be present as a husband and father. PSR ¶ 128.

Whittecar was released from supervision on his prior convictions in 2016 (PSR ¶ 20) and he wasted little time in planning and implementing a new illegal enterprise to reap significant profits. This time, rather than stealing money or

11

arming others out of state with high-powered firearms, he elected to exploit the controlled substance addictions of others for his own gain. In doing so, he distributed enormous quantities of fentanyl and methamphetamine—which appeared to be prescriptions—across several states. Whittecar personally delivered these drugs with a loaded Glock 9 mm he was prohibited from possessing. In addition, he maintained a cache of weapons and ammunition in Montana and planned to add to his arsenal.

As his mother notes, Whittecar is skilled, very smart, and could have made money legally. PSR ¶ 120. He simply chose not to. Instead, Whittecar endangered lives, livelihoods, and communities spanning from Seattle to Madison and beyond. Importantly, and unlike most drug distributors appearing before this Court, Whittecar was not content to acquire and resell fentanyl and meth. Rather, he opted to remove the middleman and manufacture dangerous and deadly Schedule II drugs and market them as prescription pills. Whittecar took great efforts to conceal his actions and, consequently, distributed these items in pound quantities at least monthly and for more than a year. Once he was finally caught, Whittecar attempted to flee on foot and then recruited his family members to hide incriminating evidence on his property before law enforcement could find it.

### B. Need for sentence imposed to serve the purpose of the criminal laws.

#### 1. Seriousness of offense

As discussed above Whittecar's crimes are extremely serious. He formulated and executed a complex plan for large-scale manufacturing and distributing of fentanyl and methamphetamine pills that he designed to look exactly like legal prescription drugs. Whittecar sold these products for over a year, by the thousands, and with a loaded Glock 9 mm semi-automatic handgun he knew he was prohibited from possessing based on his prior federal felony convictions. In perpetuating addictions and its devastating effects in so many others, Whittecar realized significant profits. He then laundered the money by purchasing several high-end vehicles, a backhoe, a trailer, and additional property and equipment to continue his enterprise with even greater efficiency.

#### 2. Promote a respect for the law

Whittecar's history, current offenses, and continued criminal thinking reflect a significant lack of respect for the law. Whittecar's statements while in jail reveal this as well. For example, in speaking with one of his sons Whittecar bragged about organizing other inmates to defy instructions from a correctional officer to lock down in retaliation for not getting access to commissary products. Government's Exhibit 1 (December 2, 2022, jail call beginning at 6:10) (filed

13

conventionally and under seal). Whittecar told the correctional officer, "I will be more than happy to make everyone of your shifts a living hell." *Id* at 8:15. Whittecar also relayed the opportunity to exploit officers when they were short-staffed: "It snowed like a foot that night so everyone knew that the cops were busy with traffic accidents and sh** so we're like, 'we kinda got the motherf****** by the balls.'" *Id* at 9:15. Whittecar then detailed an incident where he violated facility rules by passing notes to a female inmate for two months, hid the evidence in a legal mail envelope he taped beneath a table, and, when confronted by an officer, lied about why his name was on a note found in the female inmate's cell. *Id*. at 9:35.

> The next day, Whittecar said the following on a jail call:
>
> The last time I was in prison, I got snatched up when [my sons] were so young, but now it's like they know what time it is . . . I'm like their superhero for taking this sh** on the chin and not throwing anybody under the bus. Like 100%. So they're like 'You're like a legend on the street, Dad.' I swear to God they say this sh** to me. They look up my sh** and show it to their friends, there's all these newspaper articles about me . . . In Minneapolis and here in Montana . . . And there's old newspaper articles on me from when I got booked in Seattle for the gun trafficking and the bank fraud. When you Google my name, that only thing that pops up is newspaper articles of the crimes I've committed . . . It's cool to have my two oldest boys in my corner.
>
> Government's Exhibit 2 (December 3, 2022, jail call beginning at 12:26)

(filed conventionally and under seal).

14

Whittecar continued to use profanity in relation to the actors in the criminal justice system and minimized his impending sentence in this case: "And even though these motherf****** are about to break me off ten years, I should, worst case scenario with my time served, with good time, and with halfway house time, worse, worse, case scenario would be six more years—six and a half more years." *Id* at 15:35.

In yet another call, Whittecar stated his intention to execute a new profitable scheme—but one he did not want to disclose over the phone—as soon as he was placed in a BOP facility:

> Whittecar: I'll be getting out with a nice little stack of f****** money.
>
> Son: . . . hopefully it's still there when you get out. . .
>
> Whittecar: Oh no, no, no, ain't nothing f****** nowhere, between working f****** and doing whatever, hustling and s***, I only need money between now and when I actually get to prison. Once I get to prison I'm fine, I'm good.
>
> Son: Yeah, why's that?
>
> Whittecar: Like I said, you just gotta come and see me in person . . . I mean literally I'll send money home. Instead of asking people to send me money, I'll send you money. Guaranteed.

Government's Exhibit 3 (December 26, 2022, jail call beginning at 5:57) (filed conventionally and under seal).

15

Finally, in a conversation with his mother, Whittecar expressed frustration with rules generally in response to his mother abiding by the protocols for video visits:

> Whittecar: He can be on the video visits, I don't understand why everybody's weird about being on the video visits. . .
>
> Mother: We're just following instructions.
>
> Whittecar: Who gives a sh**, rules are meant to be broken, at least some of them.

Government's Exhibit 4 (December 27, 2022, jail call beginning at 4:52) (filed conventionally and under seal).

This small sampling of Whittecar's more recent statements offers insight into his true mentality. Notably his words and attitude are in stark contrast to the letter he wrote to the Court where he claimed, "[I] carry tremendous guilt and shame for what I've put my family through" and "Going forward I plan on making order from chaos, and not the other way around. I make NO excuses and I take full responsibility for ALL of my choices and actions." PSR ¶ 74.

### 3. Provide just punishment

The breadth, depth, and dangerousness of Whittecar's manufacturing and distribution scheme warrants a significant sentence. It is incalculable how many lives have been destroyed—and perhaps lost—by the controlled substances

16

Whittecar injected into the market. Whittecar's incorporation of a semi-automatic handgun into this distribution routine reflects his intention to threaten or use deadly force to protect his person, product, and profit.

### 4. Afford adequate deterrence.

A sentence at the high end of Whittecar's guideline range will deter Whittecar from engaging in crime. Based on his jail calls, Whittecar is not currently deterred from unlawful conduct. Rather, he appears determined to engage in it both now (by harassing correctional officers, violating detention facility rules, and hiding evidence) and perhaps as soon as he is placed in his BOP facility. Whittecar is 38 years old and has found financial success via only three avenues: arms dealing, bank fraud, and drug manufacturing and distribution. After serving four years in custody for the first two schemes, he quickly pivoted to the third. As such, there can be little hope Whittecar will turn over a new leaf unless he is given a significant sentence which impresses upon him that his crimes do not actually pay in the long run.

Further, a significant sentence will provide general deterrence to other potential manufacturers and distributors of fentanyl and meth. In the broad range of drug distribution conduct this Court has seen, Whittecar's actions should stand out given the many aggravating factors discussed above. The egregiousness of

17

his crimes is reflected in his guideline range and thus represents an opportunity for this Court to impose a significant sentence that will send a message that this conduct is unacceptable and will be met with significant prison time. As Whittecar noted in his jail calls, others pay attention to what the media reports about him. As such, this Court can assume others will soon learn of Whittecar's sentence and, hopefully, be deterred from engaging in the same conduct.

### 5. Protect the public

Whittecar's history, characteristics, and present criminal conduct demonstrate that he poses a significant danger to the community. This Court is aware of the dangers posed by the distribution of fentanyl, especially when it appears to be a legal prescription drug. Moreover, Whittecar was willing to use a loaded semi-automatic handgun in connection with his dealing. Whittecar had little regard for the safety of others in committing these offenses, and as demonstrated by his continued criminal thinking, he does not appear to have any sincere remorse for the harm he has caused in this or his previous crimes. Without this meaningful introspection, Whittecar remains a threat to the public. A sentence of imprisonment at the high end of the advisory guideline range will protect others by removing Whittecar from the public. It will also, hopefully, prevent future criminal conduct by Whittecar upon his release.

### 6. Provide needed educational or vocational training, medical care, or other correctional treatment.

Whittecar was kicked out of school in eighth grade for skipping classes, but he later obtained his GED and attended some college courses at Bellevue Community College. PSR ¶¶ 151-153. Whittecar advised he previously performed construction but is no longer interested in that line of work. PSR ¶ 154. Whittecar did not report any long-term employment within the past 10 years and did not identify any specific vocational skills he was interested in pursuing in prison other than "working on customizing cars." PSR ¶¶ 154, 158. His mother believes he would benefit from more education and learning a trade and stated, "He would make an excellent attorney." PSR ¶ 159.

Whittecar is physically healthy and has never been diagnosed with a mental illness. PSR ¶¶ 131, 133. He admits he has always had a gambling problem but stated he did not believe he would return to gambling once released and added he is not gambling while incarcerated. PSR ¶ 140. As to chemical dependency, Whittecar stated he first started selling pills for financial reasons but later, in 2019, he regularly began using fentanyl and increased his intake to taking the drug every 45 minutes. PSR ¶ 148. Whittecar declined to participate in RDAP while serving his previous prison sentence but now eagerly requests consideration for the

program even if it does not result in a reduction of his sentence due to his firearm possession. PSR ¶ 145.

## CONCLUSION

The government respectfully requests the court impose a sentence at the high end of Whittecar's guideline range followed by at least five years of supervised release. Such a sentence is in accord with all the § 3553(a) factors and is sufficient, but not greater than necessary.

DATED this 24th day of January 2023.

JESSE A. LASLOVICH
Acting United States Attorney

*/s/ Karla E. Painter*
KARLA E. PAINTER
Assistant U.S. Attorney